IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 1, 2019

**IN RE TREY S. ET AL.**

**Appeal from the Juvenile Court for Williamson County**
**No. 35799     Sharon Guffee, Judge**

_____

**No. M2018-01979-COA-R3-PT**

_____

A trial court terminated a mother's and father's parental rights to three children on the grounds of wanton disregard for the children's welfare, substantial noncompliance with a permanency plan, and persistence of conditions. Both parents appealed the termination. We affirm the trial court's judgment in all respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which D. MICHAEL SWINEY, C.J., and JOHN W. MCCLARTY, J., joined.

Jennifer L. Honeycutt, Franklin, Tennessee, for the appellant, Elizabeth D.R.

David Mitchell Jones, Franklin, Tennessee, for the appellant, Tony E.S., Jr.

Herbert H. Slatery, III, Attorney General and Reporter, and Matthew Daniel Cloutier, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

Karen Denise Huddleston Johnson, Brentwood, Tennessee, Guardian Ad Litem.

**OPINION**

I. INTRODUCTION

In this parental termination case, Elizabeth D.R. ("Mother") and Tony E.S., Jr. ("Father") are the parents of Trey S., Ryleigh S., and Drake S., who were born in 2009, 2011, and 2014, respectively. The Department of Children's Services ("DCS" or "the Department") took custody of the children by court order in June 2016 and filed a petition to terminate the parents' rights on December 20, 2017. The grounds DCS

asserted against Mother and Father included abandonment by incarcerated parent through wanton disregard for the children's welfare pursuant to Tenn. Code Ann. §§ 36-1-113(g)(1) and 36-1-102(1)(A)(iv). The Department also alleged the ground of persistence of conditions pursuant to Tenn. Code Ann. § 36-1-113(g)(3) against Mother and substantial noncompliance with the permanency plan pursuant to Tenn. Code Ann. § 36-1-113(g)(2) against Father. The trial court terminated both Mother's and Father's parental rights after finding that DCS proved by clear and convincing evidence each of the grounds it asserted and that it was in the children's best interests for Mother's and Father's rights to be terminated. Mother and Father each appeal the trial court's judgment, arguing that the trial court erred in holding that DCS proved by clear and convincing evidence the grounds DCS asserted and that it was in the children's best interests that the parents' rights be terminated.

## II. FACTUAL AND PROCEDURAL BACKGROUND

The Department received a referral on June 8, 2016, stating that Trey, Ryleigh, and Drake were exposed to drugs and were suffering from educational neglect, medical maltreatment, lack of supervision, and psychological harm. Mother had left the family home with the children and moved into a domestic violence shelter after Father hit her and placed her in fear for her safety. While living at the shelter, Mother obtained a six-month order of protection against Father that also covered the children. She informed a DCS employee that the children had not been to a pediatrician in over a year. Trey, the eldest child, was complaining of tooth pain while he was at the shelter, and Mother told a DCS employee that none of the children had ever seen a dentist. Trey was nearly seven years old at that point and had never attended school. While they were in the shelter, the children's immunizations were brought up to date. Mother submitted to a drug screen on June 20 and tested positive for methamphetamine, amphetamine, and buprenorphine, and she admitted to using cocaine a few weeks earlier.

The Department removed the children from Mother's custody on June 20 and filed a petition for temporary custody on June 21, 2016. The juvenile court granted the petition the day it was filed and appointed a guardian ad litem on June 24, 2016. The children were placed in a foster home shortly after their removal. Mother and Father entered into a permanency plan with DCS on July 7, 2016, and the juvenile court ratified the plan on August 9. The permanency goal was reunification with Mother and Father, and the target date was January 8, 2017. The juvenile court held an adjudicatory hearing on September 27, during which both Mother and Father stipulated to the children's dependency and neglect, and the court entered an order on October 12, 2016, adjudicating the children dependent and neglected.

Mother and Father were working with DCS, their visits with the children were going well, they were both passing drug screens, and the children went on a trial home visit starting in late May 2017. Mother and Father were living together again by this

time, and they had a new baby girl who was born shortly before the trial home visit began. On July 6, 2017, the children's home visit was terminated after Father was arrested for manufacturing between ten and seventy pounds of a Schedule VI controlled substance and Mother tested positive for methamphetamine. The children returned to the foster home where they were living before the trial home visit, and they have lived there ever since.

Following termination of the home visit in early July, DCS created a second permanency plan for Mother and Father dated July 28, 2017, which was ratified by the juvenile court on September 12, 2017. The permanency goals of this plan included reunification with the parents and adoption, and the goal target date was October 28, 2017. Mother's and Father's responsibilities under this plan included obtaining safe and stable housing, achieving financial stability, being alcohol- and drug-free, maintaining good mental health to enable them to parent the children successfully, resolving all legal issues, and remaining involved with the children while they were in the Department's custody.[1]

Mother was incarcerated on August 24, 2017, after disclosing to her probation officer that she had used methamphetamine. She was on probation from prior charges, and her drug use constituted a violation of her probation. Mother remained incarcerated until August 29, 2017. Mother underwent a hair follicle test on the day of her release, which came back positive for methamphetamine. Mother gave another hair sample on November 30, 2017, and that drug test also came back positive for methamphetamine.[2]

Father underwent a hair follicle test on August 31, 2017, and his test came back positive for methamphetamine, cocaine, benzoylecgonine, and THC. In September 2017, Father was arrested and charged with domestic assault against Mother. Mother refused to testify against Father in court, resulting in the dismissal of that charge. Father was supposed to provide a hair sample in November 2017, but he refused to submit a sample when he learned that DCS requested a sample from a location on his body other than his head.[3]

---

[1]A third permanency plan was created on September 18, 2017, when the youngest child, Hailey, was brought into DCS custody and joined Trey, Ryleigh, and Drake in their foster home. The goals and parents' responsibilities remained the same as those set forth in the earlier permanency plan. This third plan was ratified by the court on November 7, 2017, and had a target date of March 2018.

[2]Mother asserted that both hair follicle tests resulted from her use of methamphetamine on July 6, 2017.

[3]An employee from DCS testified that she had reason to believe Father had used a special shampoo on his head that could have masked any drug use and caused him to have a clean hair follicle test result regardless of actual drug use.

The Department filed its petition to terminate Mother's and Father's parental rights to Trey, Ryleigh, and Drake on December 20, 2017.[4] The case was tried over a period of five days, beginning on March 23, 2018, and ending on October 12, 2018. The juvenile court issued a very thorough final order terminating Mother's and Father's parental rights to the three children, finding that DCS proved by clear and convincing evidence each of the grounds on which it based its petition and that it was in the children's best interest that Mother's and Father's rights be terminated.

## III. STANDARD OF REVIEW

The Tennessee Supreme Court has described the appellate review of parental termination cases as follows:

> An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness.

*In re Carrington H.*, 483 S.W.3d 507, 523-24 (Tenn. 2016) (citations omitted); *see also In re Gabriella D.*, 531 S.W.3d 662, 680 (Tenn. 2017).

The termination of a parent's rights is one of the most serious decisions courts make. As the United States Supreme Court has said, "[f]ew consequences of judicial action are so grave as the severance of natural family ties." *Santosky v. Kramer*, 455 U.S. 745, 787 (1982). "Terminating parental rights has the legal effect of reducing the parent to the role of a complete stranger," *In re W.B., IV*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *6 (Tenn. Ct. App. Apr. 29, 2005), and of "severing forever all legal rights and obligations of the parent or guardian," Tenn. Code Ann. § 36-1-113(l)(1).

---

[4]The youngest child, Hailey, was not included in the termination petition.

A parent has a fundamental right, based in both the federal and state constitutions, to the care, custody, and control of his or her own child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174-75 (Tenn. 1996) (citing *Nale v. Robertson*, 871 S.W.2d 674, 678 (Tenn. 1994)); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995) (citing *Hawk v. Hawk*, 855 S.W.2d 573, 577 (Tenn. 1993)). This right "is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re Carrington H.*, 483 S.W.3d at 521 (citing U.S. CONST. amend. XIV, § 1; TENN. CONST. art. 1, § 8). While this right is fundamental, it is not absolute. *Id.* at 522. The State may interfere with parental rights in certain circumstances. *Id.* at 522-23; *In re Angela E.*, 303 S.W.3d at 250-51. Our legislature has listed the grounds upon which termination proceedings may be brought. *See* Tenn. Code Ann. § 36-1-113(g). Termination proceedings are statutory, and a parent's rights may be terminated only where a statutory basis exists. *In re Angela E.*, 303 S.W.3d at 250; *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998).

To terminate parental rights, a court must find by clear and convincing evidence the existence of at least one of the statutory grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *In re Kaliyah S.*, 455 S.W.3d 533, 552 (Tenn. 2015); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "'Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings.'" *In re Carrington H.*, 483 S.W.3d at 522 (quoting *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citations omitted)). "Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable." *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005). As a reviewing court, we "must 'distinguish between the specific facts found by the trial court and the combined weight of those facts.'" *In re Keri C.*, 384 S.W.3d 731, 744 (Tenn. Ct. App. 2010) (quoting *In re Tiffany B.*, 228 S.W.3d 148, 156 (Tenn. Ct. App. 2007)). Then, we must determine "whether the combined weight of the facts . . . clearly and convincingly establishes all of the elements required to terminate" a parent's rights. *Id.* "When it comes to live, in-court witnesses, appellate courts should afford trial courts considerable deference when reviewing issues that hinge on the witnesses' credibility because trial courts are 'uniquely positioned to observe the demeanor and conduct of witnesses.'" *Kelly v. Kelly*, 445 S.W.3d 685, 692 (Tenn. 2014) (quoting *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000)).

Once a ground for termination is established by clear and convincing evidence, the trial court or the reviewing court conducts a best interests analysis. *In re Angela E.*, 303 S.W.3d at 251. "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *Id.*

at 254. The existence of a ground for termination "does not inexorably lead to the conclusion that termination of a parent's rights is in the best interest of the child." *In re C.B.W.*, No. M2005-01817-COA-R3-PT, 2006 WL 1749534, at *6 (Tenn. Ct. App. June 26, 2006).

## IV. ANALYSIS

### A.  Grounds for Termination

#### 1.  Abandonment by Wanton Disregard (Mother and Father)

The ground for termination that DCS asserted against both Mother and Father was abandonment by incarcerated parent and conduct prior to the incarceration showing a wanton disregard for the children pursuant to Tenn. Code Ann. §§ 36-1-113(g)(1) and 36-1-102(1)(A)(iv).   Tennessee  Code  Annotated  section  36-1-102(1)(A)(iv)  defines "abandonment," in pertinent part, as:

> A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and . . . the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child. . . .

Thus, a parent who was incarcerated during all or part of the four months immediately preceding the filing of the termination petition can abandon his or her children by engaging in conduct prior to the incarceration that shows a "wanton disregard" for the children's welfare.  The Department filed the termination petition on December 20, 2017, with the result that the relevant four-month period began on August 20 and ended on December 19, 2017.  *See In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014) (explaining that statutory four-month period covers four months ending on day before termination petition is filed).

The statute does not define "wanton disregard."  *In re H.A.L.*, No. M2005-00045-COA-R3-PT, 2005 WL 954866, at *6 (Tenn. Ct. App. Apr. 25, 2005).  Tennessee courts have held that "probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *In re Audrey S.*, 182 S.W.3d at 867-68.  "Our courts have consistently held that an incarcerated parent who has multiple drug offenses and wastes the opportunity to rehabilitate themselves by continuing to abuse drugs, resulting in revocation of their parole and reincarceration, constitutes abandonment of the child, and demonstrates a

- 6 -

wanton disregard for the welfare of the child." *Dep't of Children's Servs. v. J.M.F.*, No. E2003-03081-COA-R3-PT, 2005 WL 94465, at *7 (Tenn. Ct. App. Jan. 11, 2005) (citing *In re C.T.S.*, 156 S.W.3d 18, 25 (Tenn. Ct. App. 2004); *Dep't of Children's Servs. v. J.S.*, No. M2000-03212-COA-R3-JV, 2001 WL 1285894, at *3 (Tenn. Ct. App. Oct. 25, 2001); *In re C.W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000); *G.M.C. v. A.V.I.*, No. E2000-00134-COA-R3-CV, 2000 WL 1195686, at *5-6 (Tenn. Ct. App. Aug. 23, 2000); *Dep't. of Children's Servs. v. Wiley*, No. 03A01-9903-JV-00091, 1999 WL 1068726, at *7 (Tenn. Ct. App. Nov. 24, 1999)).

The enactment of Tenn. Code Ann. § 36-1-102(1)(A)(iv) reflects the General Assembly's recognition that "parental incarceration is a strong indicator that there may be problems in the home that threaten the welfare of the child" and that "[i]ncarceration severely compromises a parent's ability to perform his or her parental duties." *In re Audrey S.*, 182 S.W.3d at 866. "The actions that our courts have commonly found to constitute wanton disregard reflect a 'me first' attitude involving the intentional performance of illegal or unreasonable acts and indifference to the consequences of the actions for the child." *In re Anthony R.*, No. M2014-01753-COA-R3-PT, 2015 WL 3611244, at *3 (Tenn. Ct. App. June 9, 2015).

Courts are not limited to the four-month period preceding a parent's incarceration to determine whether the parent has engaged in conduct evidencing a wanton disregard for his or her children's welfare. *Id.* at *2; *In re F.N.M.*, No. M2015-00519-COA-R3-PT, 2016 WL 3126077, at *3 (Tenn. Ct. App. Apr. 11, 2016); *see also Dep't of Children's Servs. v. Hood*, 338 S.W.3d 917, 926 (Tenn. Ct. App. 2009) ("parental conduct exhibiting wanton disregard for a child's welfare may occur at any time prior to incarceration and is not limited to acts occurring during the four-month period immediately preceding the parent's incarceration"). Incarceration itself is not grounds for the termination of a parent's rights, but courts consider the incarceration a "triggering mechanism that allows the court to take a closer look at the child's situation to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child." *In re Audrey S.*, 182 S.W.3d at 866.

a. Mother

In concluding that DCS proved this ground against Mother by clear and convincing evidence, the trial court wrote:

> The proof is undisputed Mother was incarcerated on a probation violation in Williamson County (for a 2014 felony drug conviction) from August 24-29, 2017, for a positive drug screen for methamphetamine and three additional new charges in multiple other jurisdictions (Davidson and Sumner Counties.)

Mother testified she was also on probation in Fairview and Cheatham County. She was unable to get her driver's license because of her inability to pay all the court costs and fines due to her criminal behavior. She tested positive for methamphetamine *while the children were on a trial home visit*. Although she denied knowledge Father was growing marijuana plants at home, there was contradictory evidence from the children that Mother would help water the plants. It was the family's "secret garden."

Mother admitted the children suffered from medical neglect for dental work. They had never been to the dentist. The testimony was the children's teeth were rotting out causing extensive dental work requiring anesthesia. She said she was incarcerated at the time and Father had the children. When she got out of jail, she did not have transportation.

She admitted to several years of drug abuse including cocaine, opiates and meth. She had some treatment in 2012 but did not ever complete a program. She would use every four to five months when she would break up with Father. She was in suboxone treatment off and on since 2012. Her substance abuse treatment was sporadic at best.

. . . .

Mother admitted stress is her trigger to relapse. She testified she was overwhelmed during the trial home visit and unable to manage the children despite frequent visits from DCS, CASA and foster mother.

Mother admitted at trial that she was incarcerated from August 24 through 29, 2017, which was during the relevant four-month period of August 20 to December 19, 2017.[5] She was incarcerated for violating her probation by using illegal drugs. Mother's

---

[5]Mother was incarcerated for five days, and she argues that periods of incarceration of less than seven days are treated as periods of nonincarceration under Tenn. Code Ann. § 36-1-102(1)(A)(iv). However, the statute does not require Mother to be incarcerated for any particular number of days during the relevant four-month period for abandonment by wanton disregard to apply. The statute requires only that a parent be incarcerated "during all or part of the four (4) months immediately preceding the institution of such action or proceeding." Tenn. Code Ann. § 36-1-102(1)(A)(iv). The portion of the statute on which Mother relies states:

> If the four-month period immediately preceding the institution of the action or the four-month period immediately preceding such parent's incarceration is interrupted by a period or periods of incarceration, and there are not four (4) consecutive months without incarceration immediately preceding either event, a four-month period shall be created by aggregating the shorter periods of nonincarceration beginning with the most recent period of nonincarceration prior to commencement of the action and moving back in time.

- 8 -

criminal history goes back to 2012, when she was convicted of simple possession. Mother explained that she was abusing medicine for which she had a prescription. She was also charged with prescription fraud and criminal impersonation in 2014 or 2015. Mother used methamphetamine after Father was arrested in July 2016, while the children were with her on their trial home visit. Mother was on probation at the time, and her drug use constituted a violation of her probation.

Mother's criminal history is intertwined with her substance abuse. Mother testified that her drug use began six years before trial, in 2012. Initially, Mother's use was limited to Oxycodone and Opana. Mother testified that she sought treatment for her drug abuse beginning in 2012 or 2013, when she went to "detox off the pain pills." She was clean for about three years, but then she started using cocaine. Mother was asked how often she used, and she responded:

> I was - - mostly I would binge. Like, if we would break up. I would go to [a friend's] house, and that's when I would use. So maybe once every four or five months.

Mother then admitted to using methamphetamine "a couple of times" starting in 2017. When the children were placed into DCS custody in June 2016, Mother submitted to a drug screen that was positive for methamphetamine, amphetamine, and buprenorphine. Mother was surprised the test showed anything other than cocaine:

> I - - I told them that when they - - when they took the kids that I don't know why it showed up for [meth], because it was cocaine that I used. I - - I told them it was cocaine, and that's what it was, or at least that's what I thought it was.[6]

Mother explained that she relapsed around the time she lost custody of the children. She then went back into treatment and completed a twenty-eight-day program between July and August 2016. Mother testified that she went to an outpatient clinic every other week to get Suboxone, which helped with her prior addiction to opiates, and saw a therapist once a month.

---

Periods of incarceration of less than seven (7) days duration shall be counted as periods of nonincarceration.

Tenn. Code Ann. § 36-1-102(1)(A)(iv). As the quoted language shows, periods of nonincarceration of less than seven days only becomes an issue when the four-month period preceding a parent's incarceration is interrupted by other periods of incarceration, which is not the case here. *See In re Steven W.*, No. M2018-00154-COA-R3-PT, 2018 WL 6264107, at *11-12 (Tenn. Ct. App. Nov. 28, 2018) (relying on cited language to determine four-month relevant period by piecing together parent's periods of nonincarceration prior to filing of petition for termination).

[6]The trial court found "Mother's credibility to be woefully inadequate."

Mother denied that alcohol had been a problem for her, yet she testified that she "drank too much" one night in September 2017 when Father was arrested outside her house and charged with domestic abuse. When asked what transpired that night leading up to Father's arrest, Mother responded that she did not "really remember that night much" because she "had a lot to drink." Mother testified that the children had witnessed arguments between her and Father and that her daughter witnessed Father's physical abuse of Mother that led Mother to seek a restraining order against him.

The evidence revealed that Mother was not taking proper care of the children's medical and/or dental needs before they entered the State's custody. None of the children had ever been to a dentist, and they all had serious problems with their teeth when they entered DCS custody. They were also behind on their immunizations when they went with Mother to the shelter in June 2016. Trey was nearly seven years old when the children were removed from Mother's care, yet he had never been to school. The foster mother testified that Trey did not know how to hold a pencil and could not identify letters of the alphabet.

We find the evidence clearly and convincingly shows that Mother abandoned the children by engaging in conduct prior to her incarceration that exhibited a wanton disregard for her children's welfare. As this Court has said, probation violations, criminal behavior, substance abuse, and the failure to provide properly for the children constitute the sort of conduct that exhibits a wanton disregard for the children's welfare. *See In re Audrey S.*, 182 S.W.3d at 867-68.

> b. Father

In concluding that DCS proved this ground against Father by clear and convincing evidence, the trial court wrote:

> Father admitted he was incarcerated for a couple days in September 2017 on a "re-arrest" or failure to appear warrant. He was not sure about incarceration in October and December 2017. He was arrested for felony Manufacturing Schedule VI Controlled Substance between 10-70 pounds on July 3, 2017. He spent a day in jail before bonding out.
>
> . . . .
>
> . . . There is credible evidence Father may have been altering his drug screens from the beginning of this case based on Mother's testimony. . . . He has a history of criminal convictions dating back to 2005 including drug charges, theft, probation violations, and domestic assault charges.

- 10 -

Further, there was much testimony regarding the children's extensive dental needs because the parents did not take them to the dentist. Father testified he took the oldest child once but since he could not prove paternity, he was turned away. The oldest child was never enrolled in school. He was almost seven when he was placed in foster care.

Father was incarcerated for a portion of the relevant period. . . . The Court can find easily he has engaged in conduct that exhibits a wanton disregard for the welfare of the children.

Father testified that he was incarcerated in September 2017 for a "re-arrest warrant" based on his failure to appear for a court date. In September 2017 Father was charged with domestic assault against Mother.[7] He testified that he was uncertain whether he was incarcerated during October or December 2017. Father was subject to a restraining order in June 2016 that precluded him from being around Mother or the children for six months based on domestic abuse by Father against Mother at the end of May 2016. The Department presented evidence that Father was physically abusive to Mother in front of his daughter. At the time of trial, Father had charges pending against him for manufacturing between ten and seventy pounds of a controlled substance while the children were on their trial home visit during the spring and summer of 2017.

From the time the children were removed from Mother's custody until the time of the trial home visit, Father passed all of his drug screens. Father testified that he was not using drugs during that period. After he was arrested in July 2017 and the children's trial home visit was terminated, however, Father testified that he began using drugs "[m]aybe a couple times a month." Father failed a hair follicle test at the end of August 2017, as discussed above, and he refused to provide a hair sample a few months later, in November. Evidence was also presented that he was altering his urine drug tests. Tamera Stamps, who was the DCS family service worker assigned to the children's case from September 2016 through March 2018, testified that Mother alerted her via text message in July 2017 that Father was altering his urine drug screens. According to Ms. Stamps:

In [Mother's] text messages, [she] was generally saying that she knew that [Father] was - - he was basically altering the drug screens. He was using his father's urine, when he does the drug screens, that he intentionally goes late to the detention center because they're not really paying attention at that time, and that's when he brings in the urine for the screens.

At trial, Mother testified that she did not remember sending texts to Ms. Stamps regarding Father's alteration of his drug screens. Printouts of Mother's text messages to

---

[7]That charge was dropped when Mother refused to testify against him at the trial in December 2017.

Ms. Stamps were introduced into evidence, however, and they support Ms. Stamps' testimony.

With regard to the children's dental and medical care, Father testified that he attempted to take Trey to see a dentist on one occasion before the children entered DCS custody. Because Father was unable to prove he was Trey's father, however, the dentist refused to see the child. No evidence was introduced regarding any other efforts Father made to have the children properly immunized or to register Trey for school.

We find that the evidence is clear and convincing that Father abandoned the children by engaging in conduct prior to his incarceration that exhibited a wanton disregard for the children's welfare. Father's behavior included the intentional performance of illegal or unreasonable conduct and shows his indifference to the consequences of his actions on his children. His conduct illustrates the "me first" attitude that our courts have found constitutes abandonment by wanton disregard for the children's welfare. *See In re Anthony R.*, 2015 WL 3611244, at *3.

2. Substantial Noncompliance with Permanency Plan (Father)

Terminating a parent's rights for substantial noncompliance with a permanency plan pursuant to Tenn. Code Ann. § 36-1-113(g)(2) requires the petitioner to show, initially, "that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place." *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004) (citing *In re Valentine*, 79 S.W.3d at 547-49 and *In re L.J.C.*, 124 S.W.3d 609, 621 (Tenn. Ct. App. 2003)); *see* Tenn. Code Ann. § 37-2-403(a)(2)(C) ("[s]ubstantial noncompliance by the parent with the statement of responsibilities provides grounds for the termination of parental rights . . ."). If the trial court fails to make a finding regarding the reasonableness of the parent's responsibilities under the permanency plan, the reviewing court must review this issue de novo. *In re Valentine*, 79 S.W.3d at 547. Next, the petitioner must demonstrate "that the parent's noncompliance is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met." *In re M.J.B.*, 140 S.W.3d at 656 (citing *In re Valentine*, 79 S.W.3d at 547-49 and *In re Z.J.S.*, No. M2002-02235-COA-R3-JV, 2003 WL 21266854, at *12 (Tenn. Ct. App. June 3, 2003)). "Substantial" has been defined as "[i]mportant, essential, and material; of real worth and importance." BLACK'S LAW DICTIONARY (10th ed. 2014). When considering whether a parent's noncompliance is substantial for purposes of terminating his or her parental rights, "the real worth and importance of noncompliance should be measured by both the degree of noncompliance and the weight assigned to that requirement." *In re Valentine*, 79 S.W.3d at 548.

In concluding that DCS proved by clear and convincing evidence that Father was substantially noncompliant with the statement of responsibilities in the second and third

permanency plans, the trial court initially determined that the permanency plans "were reasonable and related to remedying the conditions which necessitated foster care placement." The court then wrote:

> The second permanency plan created on July 28, 2017 (after the trial home visit disrupted) and ratified in court on September 12, 2017 had a dual goal of return to parent and adoption. . . . The requirements of the second plan were (1) safe and stable housing and income, (2) be alcohol and drug free and maintain sobriety, (3) have good mental health and successfully parent children, (4) resolve legal issues and (5) remain involved with the children.

> The concern was raised through Mother that Father had been altering his drug screens prior to the trial home visit. Father's August 31, 2017 hair follicle test was positive for marijuana, methamphetamine and cocaine. He refused to submit to a hair follicle test in November 2017 using the hair under his arms. He then had no contact with DCS except a text he sent (from Mother's phone) on February 19, 2018, asking about his visitation. Father tested positive on the August 1, 2018 trial date for marijuana, methamphetamine and opiates. He admitted to using marijuana and meth after his 45 day hospitalization in August and September 2018. On the October 4, 2018 trial date Father testified he would test positive for methamphetamine and marijuana.

> Additionally, Father never provided proof of income after the trial home visit was revoked. He testified at trial he was not working and he was still living with his father and grandfather. He admitted it was not an appropriate place for the children to live. His father has some criminal history. He did get another alcohol and drug assessment at Bradford in October 2017 but did not allow for any collateral contacts. He said they made no recommendations. He testified he "did not and does not have a substance abuse issue." He admitted he did not complete the domestic violence classes. He "got mad and quit going."

> Father was arrested for felony manufacturing of marijuana in July 2017 during the trial home visit. That case is still pending. He admitted he does not have a driver's license because he failed to appear in court. Two months ago he was arrested for driving on a revoked license and two weeks ago he was arrested for failure to appear. Clearly, legal issues have not been resolved per the permanency plan.

> Ms. Smith, the current DCS worker since July 2, 2018, said she began trying to contact Father as soon as she got the case. He finally called

her when he was in the hospital (August 2018) from the same phone number. Father admitted he has not seen his children since nine months ago at a court hearing. Ms. Stamps testified Father has not visited since the trial home visit. Ms. Smith said Father had not completed any of the tasks on the plan.

The Department provided reasonable efforts and assistance to Father to complete the tasks by paying for hair follicle drug tests, providing random drug screens, set[ting] up the parenting assessment, giving Father information about where to obtain an alcohol and drug assessment and the clinical assessment.

The Court must find the noncompliance was substantial, that unsatisfied requirements must be important in the plan's scheme. All three DCS workers and the CASA advocate testified substance abuse was a main priority in the case and was still the biggest concern. Additionally, the on-again off-again relationship between the parents, including domestic violence, was of great concern and also lack of transportation for both parents.

The Court finds the reason the children were removed in the first place was due to drug use and domestic violence (June 2016). The reason the trial home visit was disrupted was because of drug use. Father was again arrested for domestic violence in September 2017. Both parents tested positive for drugs through November 2017 (the Court considers Father's refusal of the hair follicle test to be likely a positive screen).

By his own admission, Father testified . . . to using multiple substances at least a couple times a month.

It could simply not be clearer that Father is substantially noncompliant with the requirements of the permanency plan. Who comes to a termination of parental rights trial on multiple days testing positive for multiple controlled substances? He has made no effort to comply with maintaining his sobriety or to complete any of [the] tasks on the plan.

When Father was in court testifying on behalf of himself on August 1, 2018, he testified that he did not have a drug problem when the children were brought into DCS custody in June 2016 and that he did not currently have a drug problem. While he was testifying, the trial judge noticed that Father was slurring some of his words and asked, "Mr. [S.], are you under the influence of anything this afternoon?" Father responded "No, ma'am." The DCS attorney suggested conducting a drug test to make sure Father was competent to continue testifying. The court took a recess for Father to undergo a

urine test, and once the results of the drug test were available, he was given an opportunity to retract his earlier statement that he would pass a drug test. Father stated "I am retracting [my earlier statement]. I – I would fail a drug test." Father tested positive that day for benzoylecgonine, THC, methamphetamine, and opiates.

The individual who administered the drug test in court that day, Drason Beasley, also testified. Mr. Beasley testified that he asked Father to empty his pockets and to place all of his personal items in a locker. After placing some items in the locker, Father indicated he had nothing else on him. According to Mr. Beasley:

A: I patted him down on his person. And about his midsection, there I felt a round cylinder object that felt to believed [sic] to be like a pill bottle. . . . And so I asked him to basically give it to me. I said, Well, you know, you have to hand that over, and he did, and he shook it out of his leg of his jean - - I think it was his right leg - - and he placed it in my hand.

Q: Okay. And what was it that he handed you?

A: It was a orange-ish - - orange type of common prescription bottle that you would get normal pills from the pharmacy, but it was orange in color. I cannot remember the lid, maybe it was white, but it had - - a substance, a liquid-type substance in it. I did not unscrew it. I did not inhale to inquire if it was a mask for a urine specimen or not, but that's what I identified.

Father spent several weeks in the hospital in August and September 2018, and he testified on October 4, 2018, that he "smoked pot" and used methamphetamine since he was released from the hospital three weeks earlier. When Father returned to court to testify on October 4, 2018, he admitted that if he were given a drug test that day, he would test positive for methamphetamine and marijuana:

Q: So, Mr. [S.], I know you said today you're not under the influence, but if you're to take a drug screen today, what is it going to show positive for?

A: What I've admitted to.

Q: Meth and marijuana both?

A: Yes.

Father does not challenge any of the trial court's findings of fact, and our review of the record reveals that the trial court's findings are supported by the transcripts and exhibits. The Department established that, by the time of trial, Father was in substantial noncompliance with his responsibilities under the most recent permanency plan: he had

- 15 -

not obtained housing for the children that was safe or stable, he was unemployed, he was not drug-free, and he failed to introduce evidence that he had resolved any of his legal issues.  Father admitted that he had not seen his children for nine months, which shows that he was neither successfully parenting the children nor remaining involved in their lives.  Lastly, Father failed to complete the domestic violence classes he was directed to attend.   We conclude that, as to Father, DCS established by clear and convincing evidence the ground of substantial noncompliance with the current permanency plan.[8]

3.  Persistence of Conditions (Mother)

When DCS filed the termination petition, the persistence of conditions ground for terminating parental rights was worded in the statute as follows:

> The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
>
> (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent or parents or the guardian or guardians, still persist;
>
> (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or parents or the guardian or guardians in the near future; and
>
> (C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

Tenn. Code Ann. § 36-1-113(g)(3) (2017).[9]

---

[8]Father argues that the trial court erred in concluding he was in substantial noncompliance with the permanency plan because his youngest child, Hailey, was added to the third permanency plan and the target date of that plan was in March 2018, which was after the termination petition was filed.  As we and the trial court noted, Father's responsibilities were identical under the second and third permanency plans.  The fact that Hailey was removed from her parents' custody after her siblings and is not included in these proceedings does not affect the trial court's or this Court's ability to conclude that Father was in substantial noncompliance with his responsibilities under the plans with regard to Trey, Ryleigh, and Drake.

[9]The current version, effective July 1, 2018, includes the additional requirement that a petition have been filed in the juvenile court alleging that the child is dependent and neglected.  Tenn. Code Ann. § 36-1-113(g)(3)(A).

The purpose behind this ground is "'to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child.'" *In re Jasmine B.*, No. M2016-00464-COA-R3-PT, 2016 WL 5345339, at *12 (Tenn. Ct. App. Sept. 22, 2016) (quoting *In re Arteria H.*, 326 S.W.3d 167, 178 (Tenn. Ct. App. 2010), *overruled on other grounds by In re Kaliyah S.*, 455 S.W.3d 533 (Tenn. 2015)); *see also In re Dakota C.R.*, 404 S.W.3d 484, 499 (Tenn. Ct. App. 2012). The statute does not require the parent's failure to remedy the conditions that led to the children's removal to be willful. *In re Dakota C.R.*, 404 S.W.3d at 499.

The trial court addressed each of the conditions that DCS was required to prove to establish this ground by clear and convincing evidence. It wrote, in pertinent part:

(A) ***The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent, still exist.*** In this case, Mother's drug use, the domestic violence between the parents and the medical and educational neglect caused the removal of the children. It is foremost due to Mother's substance abuse that the Court finds is the main reason the children would be subject to further abuse and neglect. Mother's substance abuse history is substantial. She has at least a six-year pattern of serious drug use of multiple controlled substances including cocaine (injected for a year), opiates (oxycodone, opana), methamphetamine and at least one reference to heroin (12/6/16 notes) in Exhibit #5 (Mother's records from Middle Tennessee Addiction Center). Mother had never completed a treatment program until 2016 when her children were removed. While Mother testified she has been in treatment since that time, the records reflect that even after a year of outpatient treatment she had an assessment (9/13/17) that reflected "high symptom severity for many categories including use of drugs, bipolar diagnosis risk, anxiety disorder risk and alcohol use of 6+ drinks per occasion on a monthly basis indicating a high risk." Also documented in Mother's records are several drug screens with a low creatinine level indicating the ability to detect some drugs could be compromised. These drug screens were in 2017 and 2018. Alcohol was detected in November 2017 and meth, amphetamine, and promethazine on 12/27/17 (almost a year and a half from the start of treatment.) (Exhibit #5) Mother had a second alcohol and drug assessment after the trial home visit disrupted that recommend she abstain from alcohol. First she testified she did not remember if alcohol was addressed in that assessment. Later she testified it was part of it. Yet during the September 2017 domestic incident with Father, Mother admitted she had a lot to drink. She testified at Father's

- 17 -

court hearing she was "black-out" or "pass-out" drunk. Mother has been in continuous treatment and attending NA/AA meetings for the duration of this case. For her to testify at trial she was not aware she could not use alcohol during her recovery is implausible. By the time of trial, she had been in some type of ongoing substance abuse treatment for 2 1/2 years.

It is true Mother has mostly passed her drug screens administered by the Department. It is also clear that no one (except the Addiction Center on 11/9/17) screened Mother for alcohol until she came to court under the influence of alcohol on July 17, 2018 (Exhibit #19 .123 breathalyzer). Since that time, Mother has (1) denied it was alcohol; she said she was taking robitussin (later she changed her story to admitting buying and bringing an alcoholic beverage to court because she was stressed), (2) denied alcohol use from July 23, 2018 alcohol test (Exhibit #11 positive for alcohol that could not have been a result of the July 17 alcohol use) and (3) denied any alcohol use since the July court hearing but tested positive for alcohol on September 18, 2018 (Exhibit # 20). The Court finds Mother's credibility to be woefully inadequate.

Likewise, the constant back and forth relationship with Father causes the Court grave concern. This is a case of serious domestic violence. The incident that brought the children into custody (June 2016) must have been horrific for Mother and the children. Mother admits she was "really really scared." Her face was big and black. She admitted Father was hitting her but later both she and Father minimized it as falling on the bed. Father told their daughter he was going to kill Mother and she was begging Father not to kill her. An Order of Protection was put in place for six months, yet the Mother admitted to living together as soon as November 2016.

Further domestic violence occurred after the trial home visit disrupted in July 2017. Mother then told caseworkers she was afraid of Father (please do not tell him where I live). Next thing you know, they are going to the fair together in September and have an incident that draws the police. Mother is drunk. She has bruises and a skinned knee but says "this incident was not as bad as others" and her testimony in court caused the charge to be dismissed.

Then there is this constant debate as to whether the parents are back together (January 2018 Foster Care Review Board; February text from Father to DCS on Mother's phone, March Facebook post by Mother to Father). The Court cannot believe a single word either of these parents say in regards to their relationship or their substance abuse. The Court would

certainly have great concern for the children's safety if the children were to return to this uncertainty.

Yes, Mother has had stable housing since July 2017. She has had the same job during this time period. . . . The Court simply cannot find Mother to be in a healthy position to care for these children. The Court must look to the totality of the environment the children would be subjected to if they are returned. There is no doubt Mother's sobriety is triggered by the stress of caring for these children. She admitted this and there was testimony from several witnesses to corroborate it even as recently as some supervised visits.

There is also little doubt in the Court's mind that Mother and Father would soon be together again (if they are not already.) Mother has an inability to establish firm boundaries with her relationship to Father and the risk of continued domestic violence is huge. These children deserve a safe home.

Since there is a great likelihood of substance abuse, the children would be caught right back in the same scenario where not only their safety is at risk but also their medical and educational needs would be compromised. Throw in the lack of transportation (which is completely due to Mother's criminal behavior) and you have a troubling trio.

*(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent in the near future.* The reality is Mother has a life-long addiction disease with which she continues to wrestle. By denying her illness, her outcome for continued recovery is greatly diminished. It has been two and a half years and she has substituted one substance for another. She had another child removed into DCS custody a year after this case started.

Who comes to a court hearing drunk when you are trying to get your children back? Who denies any alcohol use when the proof is overwhelming you are lying? The progress made on the underlying reason the children came into custody has not been enough and it has not been substantial. Mother continues to be stressed. She admits stress causes her to relapse. She testified she is now on yet another medication to help her with stress (Vistaril). . . . How long do the children have to wait? These children deserve a safe home.

*(C) The continuation of the parent and child relationship greatly diminishes the child's chances of early integration into a safe, stable and*

***permanent home.*** No one said it better than the foster mother. In a "dream scenario" the children would get to stay where they are but still see their parents. Because they don't hate them. But the oldest carries guilt. He has to choose. They want to be adopted. They are in a tremendously safe and stable environment and they know it. They can feel it. "I love how you take care of me." "Let's not tell the teacher you're my foster mom." It is so hard going back and forth. It is "disruptive to live in two worlds." These children have been in foster care for two and a half years. How much time are we going to give Mother? Listen to the nine year old: "I don't believe they have changed and I would just be coming back to you." It is not fair to these children to stay in foster care while Mother figures it out. They deserve a safe and caring environment.

Mother does not contest any of the findings by the trial court, set forth above. We find that the court's findings are supported by the record.

Mother contends that the following conditions that led to the children's removal have been remedied: their medical neglect, their exposure to domestic violence, her homelessness, and her drug issues. It is true that Mother has obtained stable housing and the children's medical issues have been addressed since they have come into DCS's custody. However, as the trial court found, Mother seems to have substituted alcohol for drugs, and Mother has not presented evidence showing that she has addressed her struggles with alcohol.

Ms. Stamps testified that she was very concerned about the relationship between Mother and Father because of the domestic violence episodes in 2016 and 2017. She explained that the potential for the children to witness additional domestic abuse in the home was a factor that led DCS to file the termination petition. Ms. Stamps testified that she was unable to get a clear answer from Mother regarding whether or not she intended to resume a relationship with Father. After Father was arrested for domestic abuse in September 2017 but before the hearing on that charge took place, Ms. Stamps testified about a conversation she had with Mother:

> Another conversation was after the fair incident. It was around the time that they had court. She did say that she -- she was nervous there at court because he kept, like, approaching her and following her around, and there was a point where he was yelling at her at that court date. She said that -- she said she told the truth, that she was not fearful the day of the fair incident. And that's what she said in court. She said that they have had, like, worse incidents in the past, but that wasn't like the previous times, so she wasn't fearful at that moment.

Ms. Stamps then explained what Mother told her about testifying at Father's domestic violence proceeding:

> She said that - - she said that she - - she felt she told the truth that day, but she was -- she wanted to go ahead and get that situation over with. She didn't want to miss any more work, and she was fearful of -- she didn't want to sit up there and say a bunch of negative things about him and -- because she was fearful of what he or his father would do, because they're very vindictive. She didn't know what they would do, or prevent her from getting her kids in any kind of way, so she said it was already decided that the domestic violence was going to get dropped, so she wasn't going to sit there and say a bunch of bad things about him due to not knowing what would happen afterwards.

At the trial of this case, Mother testified that she did not plan to resume her relationship with Father. However, Ms. Stamps testified that she had a different understanding from talking with Mother and Father following the children's trial home visit:

> Since the trial home visit? There was several times in several meetings that we had where -- again, we were trying to get clarification on if they were going to be together or not, so we can, you know, discuss whether to put couples counseling in place. And we did that add -- we did add that on the permanency plan, that if they were going to be together, that they need to do couples counseling. But whenever the question would be asked, she would say that they're not together; he would say that they are going to be together. So it was still kind of confusing about what it was going to be, but she would primarily say that -- that she doesn't know or they're not going to be together, and he would say they would.
>
> . . . .
>
> Just because, throughout the case, it's kind of been a back and forth on knowing whether they're going to be together or not, because it was very hard for us to get direct answers. It was said at one point, you know, they didn't want to tell us if they were going to be together or not, because they didn't know if it would lengthen the time that they would have the kids - - would not have the kids, or if we would add more tasks for them if they were to tell us they were going to be together. So, of course, we're thinking, well, if you do plan to be together, you're not really going to tell us if you're fearful of that, so that was a concern because we could never really get a straight answer.

Amy Finnegan was the children's court appointed special advocate, and she testified that she was concerned about returning the children to Mother because of Mother's substance abuse issues and her difficulty controlling the children. Ms. Finnegan testified as follows:

> Well, during the trial home -- during the trial home visit, which I was there, just -- Mom just didn't -- wasn't able to control the children to give them -- you know, because they were -- like she said, and I witnessed, they were physically fighting, they were screaming at each other, Mom wasn't able to step in and control that; so that would be what I observed. The second issue would be Mom's continued issues with drugs and alcohol. You know, she says that stress triggers every time she has a relapse, which she's had a couple since we got the case. She's had relapses, and every time she says it's because of the stress in her life. If she had the children back, that stress is not going to go away. It's going to be her full-time responsibility. I'm concerned that -- you know, that might be a continued issue for her.

Ms. Finnegan also testified that she was concerned that Mother would reunite with Father and Ms. Finnegan did not think that would be good for the children. Mother had told Ms. Finnegan that she was fearful of Father and did not want him to know where she lived or what her new phone number was. Ms. Finnegan testified:

> [I]n the beginning of July after the trial home visit was canceled or terminated and Mom had texted me and said, here's my new phone number, do not give it to [Father]. And then she texted me again or called me at the end of July, so a couple of weeks later, and said, here's my new address, do not give it to [Father]. I don't want him to have it. I don't want him to know where I live.

In response to a question about evidence she had that Mother and Father have been together since September 2017, Ms. Finnegan stated:

> I guess there were Facebook posts that I saw that indicated that they were still in communication and there are discussions back and forth about whether they're going to be together. I think Dad had said -- let's see. Foster Care Review Board, January 9th of 2018, the Board was asking Dad what are his intentions, and he said that he wanted to reunite with Mom. He said they wanted -- he wanted to be together; he wanted to be a family. The Board asked Mom whether she wanted to be together with Dad, and she was more noncommittal. She was like, well, I don't know. We're talking about it, you know. So, again, that's just what Mom and Dad were telling me. So, again, I have no hard-core evidence, but they were definitely talking about it.

The foster mother, Ms. P., also testified at the hearing. She explained that she and her husband were interested in adopting all four children who were residing with them – the three children at issue here as well as the youngest, Hailey. Ms. P. testified about the changes she and her husband have made to their lives to accommodate the four children:

> That's a long list. When we signed up to foster, we said we would take in one, maybe two children because we both work full time and had a four-door sedan and a two-person house with one bathroom. So we took the three in and we kept our life. We actually did have to get a new car because we couldn't get their car seats in. So immediately we got -- we sold our car and got a new car. And then, of course, childcare and car seats, and I ended up changing careers completely to accommodate having the children at home. And then when -- when we took Hailey, we ended up selling our home and moved completely. So we -- a lot, a lot of changes.

Ms. P. described the changes she observed in the children from June 2016, when they first moved into the foster home, until the trial home visit began the following May:

> [T]hey grew a lot. They really kind of woke up and came to life, especially for the educational sense. They -- they started buckling their seatbelts, which they were really proud of. They did not have a habit of that when we first got them and -- so they were proud of that. They were proud of brushing their teeth. They were really, really proud of their schoolwork. Even Drake going to daycare was really proud of his work. We had a really good, healthy, consistent routine. Even the doctor said they were healthier physically and gave me charts showing just that they had -- they've grown, matured, and were a little healthier.

Ms. P. was then asked how the children were when they returned to her house after the trial home visit was terminated in July 2017, and she responded:

> Yeah, that was -- that was the most interesting time of the last two and a half years, I would say, because they were ready to be home and stay there forever and believed that that was what was happening. And when they had to come back to us, Trey specifically was really, really angry. He asked immediately, within about 24 hours, if we would adopt him. He -- they were all very emotional. They didn't want to believe that anything had actually gone wrong because they hadn't seen anything go wrong. So they were very confused, emotional, and angry.
>
> But as the days ahead came and we got back into a -- well, we tried to have a normal routine. We sent them back to their same schools so they would have some consistency and stability. And as we got back into that routine, a

lot of that anger digressed [sic], but it was -- it's been very different since then.

The first year when we had visits or when we had not seen one of their parents for more than a week or two weeks, they were asking, "When are we going to see our Mom and Dad?" They were making notes. I even brought a few samples of every time they'd pray, they'd pray to go home and they would pray for their mom and dad. They would draw pictures and make Mother's Day and Father's Day gifts. I mean, they -- you know, they wanted to go home, and none of them are there anymore. They don't do those things. And since that point -- they've all gotten very comfortable with us, and they -- last fall -- it's been about a year ago now -- both Trey and Ryleigh admitted that they would like to stay with us; they would like to be adopted. They -- they -- they all now, probably monthly, ask if they can call us mom and dad. We've hesitantly said no to that, to wait and see how this would play out, just in an effort to not cause any more drama if they did go home.

Ms. P. said that she asked Trey at one point how he would feel if he were to go back to Mother and Father, and Trey responded, "Well, I don't believe that they've changed and I would just be waiting to come back to you again."

The ground of persistent conditions does not require that the initial conditions leading to the children's removal be the same as the conditions relied upon to establish grounds for termination. Instead, the statute requires proof that "conditions that led to the child[ren]'s removal *or other conditions that in all reasonable probability would cause the child[ren] to be subjected to further abuse or neglect* and that, therefore, prevent the child[ren]'s safe return to the care of the parent . . . still persist." Tenn. Code Ann. § 36-1-113(g)(3)(A) (emphasis added). The trial court wrote that it "could not believe a single word" Mother said regarding her substance abuse or her relationship with Father. We conclude that DCS proved the ground of persistent conditions against Mother by clear and convincing evidence and affirm the trial court's judgment with respect to this ground. *See State v. CBH*, No. E2003-03000-COA-R3-PT, 2004 WL 1698209, at *2 (Tenn. Ct. App. July 29, 2004) ("the history of past behavior is relevant to the issue of future behavior").

B. <u>Best Interests of the Children</u>

Having found clear and convincing evidence exists to terminate Mother's and Father's parental rights on the grounds addressed above, we next consider whether the trial court properly determined that termination of Mother's and Father's rights is in the children's best interests. *See* Tenn. Code Ann. § 36-1-113(c)(2); *In re Audrey S.*, 182

S.W.3d at 860. The best interests of the children "must be viewed from the child[ren]'s, rather than the parent[s]' perspective." *In re Audrey S.*, 182 S.W.3d at 878.

The factors a trial court is to consider in determining whether terminating a parent's rights to a child is in the child's best interests are set forth in Tenn. Code Ann. § 36-1-113(i). Courts are not to conduct a "rote examination" of the factors set forth in the statute to determine whether the factors add up to favor a parent or not. *In re Audrey S.*, 182 S.W.3d at 878. Rather, the "relevancy and weight to be given each factor depends on the unique facts of each case," and "depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *Id.* (citing *White v. Moody*, 171 S.W.3d at 194). "Facts relevant to a child's best interests need only be established by a preponderance of the evidence, although DCS must establish that the combined weight of the proven facts amounts to clear and convincing evidence that termination is in the child's best interests." *In re Carrington H.*, 483 S.W.3d at 535 (citing *In re Kaliyah S.*, 455 S.W.3d at 555). When the best interests of the children conflict with those of the parent[s], "such conflict shall always be resolved to favor the rights and the best interests of the child." Tenn. Code Ann. § 36-1-101(d).

The trial court considered each of the statutory factors and found as follows:

(1) *Whether the parent has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent.*

FATHER: Father continues to fail drug screens for multiple substances. He is not working nor does he have a stable home that is appropriate for the children. Father's circumstances have actually declined substantially from the first year the children were in foster care.

MOTHER: While Mother has made some good progress on the requirements asked of her, she continues to struggle with substance abuse to the extent that it is unsafe for the children to be returned to her home. Since this is the paramount reason the children were placed into foster care, it is the priority outcome that is missing from Mother's circumstances. It remains unclear whether she will be able to make a lasting adjustment in the near future. This uncertainty is what the children are trapped in. The Court places great weight on this factor for finding termination is in the children's best interest.

(2) *Whether the parent has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible.*

- 25 -

FATHER: DCS has provided reasonable efforts by arranging payment of hair follicle drug screens for Father. Father refused to take one. DCS has been available to drug screen Father during the entirety of this case. Father has not maintained contact with the Department. DCS set up the parenting assessment and gave Father information on where to obtain an alcohol and drug assessment and a clinical assessment. DCS has tried to contact Father during this case, but even though Father had the same phone number the caseworker was using to reach him, he would not return their calls even as recently as July 2018. Since Father has tested positive for multiple substances in August, September and October 2018, a lasting adjustment does not appear to be even remotely possible.

MOTHER: DCS has assisted with numerous random drug screens and payment of hair follicle tests and an alcohol and drug assessment for Mother (September 2017). The Department provided a clinical assessment for Mother and parenting assessment. They provided supervised visitation both through a provider agency and DCS caseworkers for two and a half years. They monitored the trial home visit in June 2017. They have maintained constant contact with Mother and provided support for her whenever necessary. Despite all of this, Mother continues to struggle with substance abuse, substituting alcohol for drugs as recently as September 2018.

(3) *Whether the parent has maintained regular visitation or other contact with the child.*

FATHER: By Father's testimony, the last time he saw his children was nine months ago at a court hearing. DCS testified Father has not visited with the children since the trial home visit was disrupted in early July 2017, almost sixteen months ago. Father has made no effort to maintain regular visitation with the children.

MOTHER: Mother has consistently visited with the children during the entirety of the case. However, Mother has not had unsupervised visits or overnight visits since the trial home visit was revoked. She continues to struggle with managing all the children at once.

(4) *Whether a meaningful relationship has otherwise been established between the parent and the child.*

FATHER: Since Father has not visited in such a long time, it cannot be said there is any type of meaningful relationship with the children. Father has had literally no contact with them. The children have asked to call the foster

parents "mom and dad." It is likely the youngest (who were two and four when removed) have little memory of Father.

MOTHER: While Mother is regularly visiting and the children love her, it cannot be said there is a meaningful relationship. Foster mother testified the children want to be adopted. They ask to be adopted. When they had to miss a visit recently because of illness, "they never skipped a beat." Since the disrupted trial home visit, foster mother has noticed a change. The children used to ask to see their parents, wanted to go home all the time. Now foster mom cannot recall the last time they asked about seeing Mother. They are very bonded with the foster parents.

(5) *The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition.*

BOTH PARENTS: The Court places great weight on this factor. These children have been tossed about all of their lifetime. When Mother and Father would split up (which was every four or five months because of domestic violence and drug use), they would go stay with grandmother or Father. They have witnessed numerous (bad) fights between their parents. After a few weeks in their foster home, they were amazed how "quiet" it was. The oldest was almost seven and was not in school. He had never held a pencil. Their teeth were literally rotting out.

They have been in the same foster home for this entire two plus years. Fortunately, they were able to return to the same foster home after the trial home visit disrupted (something that rarely happens in DCS world.) The foster parents love them unconditionally and want to adopt them. They have dramatically changed their lives for these children and the children feel that. They are safe and secure. The Court fears the outcome would be EXACTLY the same as the failed trial home visit if the children were to return home at this point. Mother's substance abuse and stress level is parallel to where she was in June 2017.

(6) *Whether the parent or other person residing with the parent has shown brutality, physical, sexual, emotional or psychological abuse or neglect toward the child or another child or adult in the family or household.*

BOTH PARENTS: The proof is clear there were many acts of serious domestic violence in the home between the parents. They fought and argued a lot. Mother admitted the children saw it. The children were without a doubt negatively and psychologically impacted by that. The Court finds the likelihood the parents will be or are together to be great.

- 27 -

(7) *Whether the physical environment of the parent's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol [or] controlled substances as may render the parent consistently unable to care for the child in a safe and stable manner.*

FATHER: Father's own drug use makes it impossible to safely care for himself much less these children. Additionally, he admitted his home is not appropriate for them. He is living with his father who has a criminal history and his grandfather.

MOTHER: While Mother's home is physically safe, as noted above, it is not just the bricks and mortar. It is the unhealthy environment Mother is trapped in because of her substance abuse of (most recently) alcohol. The Court has no trouble finding Mother is unable to care for these children at this time after over two years of continuous substance abuse treatment.

(8) *Whether the parent's mental and/or emotional status would be detrimental to the child or prevent the parent from effectively providing safe and stable care and supervision for the child.*

FATHER: Again, because of Father's use of multiple substances, he is unfit to effectively provide a safe home for these children.

MOTHER: Mother has likely been self-medicating for years due to her anxiety and possibly undiagnosed mental illness. Even after a year of treatment, the September 2017 assessment at her Addiction Center indicated several categories she was at high risk such as use of drugs, bipolar disorder, anxiety disorder and alcohol use. Her current regular alcohol use to the extent that she would come to court under the influence, tells the Court she is nowhere near ready mentally or emotionally to provide a safe home for the children.

(9) *Whether the parent has paid child support consistent with the child support guidelines.*

FATHER: Both parents were ordered to pay child support. Father's testified he has not been working but hopes to get his old job back. It is not in the record whether he is behind on his child support but the Court can infer from his testimony that he may not be current.

MOTHER: Mother has been paying child support through wage assignment garnishment and income tax garnishment. She admits she owes some arrears but the amount is not significant.

In addition to the trial court's findings, which are supported by the record, we note that the evidence revealed that Father's criminal conduct continued through the trial of this case. In the summer or fall of 2018 Father was arrested for driving on a suspended license and then for failure to appear for a scheduled hearing. Father asserts that terminating his parental rights to Trey, Ryleigh, and Drake is not in the children's best interests because the trial court found in September 2017, when Hailey was added to the third permanency plan, that it was in all four of the children's interests to live together. Even though Hailey is currently residing with her older siblings in foster care, Hailey is not included in the instant termination petition. The termination of Father's rights to the three older children may, therefore, result in their eventual separation from Hailey. However, the desire for the four children to continue living together is not a reason to find that terminating Father's rights to the three older children is not in the older children's best interests. This Court has found that terminating a parent's rights to multiple children may be in the children's best interests even when they are separated and placed in different homes. *See In re Keara J.*, 376 S.W.3d 86, 104-07 (Tenn. Ct. App. 2012) (holding that termination of parental rights was in both children's best interests even though children were living with separate foster families).

Mother makes the same argument as Father with regard to keeping the four children together. In addition, she points out that she has maintained housing and employment for about a year, has maintained regular visitation with the children, and has paid child support. She contends she has made an adjustment of circumstances so that it would be in the children's best interests for them to return to her home. However, she too has continued to incur criminal charges throughout the pendency of this case. She was arrested for failure to appear in September 2018 and driving on a suspended license on June 13, 2018. There is no doubt that the children love Mother and that Mother has a bond with the children. Unfortunately, the steps Mother has taken are not enough to overcome the issues that have been problematic in the past and appear likely to continue into the future, including Mother's substance abuse and her unstable relationship with Father. The children are thriving in their foster home and are doing well in school. We affirm the trial court's holding that it is in the children's best interests that Mother's parental rights be terminated.

## V. CONCLUSION

The judgment of the trial court is affirmed, and this matter is remanded with costs of appeal assessed in equal parts against the appellants, Elizabeth D.R. and Tony E.S., Jr., for which execution may issue if necessary.

_____
ANDY D. BENNETT, JUDGE